Filed 4/9/25  P. v. Martinez CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E082346 |
| v. | (Super.Ct.No. INF1402996) |
| CARLOS JAY MARTINEZ, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  John D. Molloy, Judge. Affirmed.

Alex Coolman, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Melissa A. Mandel, Seth M. Friedman, and Joseph C. Anagnos, Deputy Attorneys General, for Plaintiff and Respondent.

1

In 2018, a jury convicted defendant Carlos Jay Martinez[1] of second degree murder and assault with a deadly weapon (screwdriver), along with enhancement allegations, culminating in an aggregate sentence of 36 years to life. In 2022, Carlos filed a petition for resentencing pursuant to Penal Code[2] section 1172.6, alleging his conviction was invalid because he was not the actual killer and was convicted under the natural and probable consequences doctrine, currently precluded by amendments to sections 188 and 189. The superior court ordered an evidentiary hearing, but, after considering the evidence, it denied the petition. Carlos appeals.

On appeal, Carlos argues (1) the trial court misunderstood the elements of the applicable offense in denying the petition because Carlos's conduct was consistent with aiding and abetting malice murder; (2) the trial court's factual findings are not supported by substantial evidence; and (3) the matter should be remanded with directions to consider the role of Carlos's youth in the commission of the offense. We affirm.

**BACKGROUND**

At the evidentiary hearing of August 18, 2023, Carlos proffered, as new evidence, the testimony of his codefendant Noel, whose testimony the trial court found to be incredible. In addition, the People proffered the clerk's and reporter's transcripts from

---

[1]    A codefendant, Noel Hernandez (Noel), was the actual shooter. Because defendant had the same surname as the victim, Fabian Martinez (Fabian), who was unrelated, we refer to defendant by his first name, Carlos.

[2]    All statutory references are to the Penal Code unless otherwise indicated.

the original trial, along with the opinion from the direct appeal in *People v. Hernandez et al.* (Oct. 13, 2020, E070630) [nonpub. opn.] (*Hernandez et al.*), requesting that the superior court take judicial notice of these matters in addition to the court's files.[3]

We recite the facts of the offense using the record from the direct appeal, in *Hernandez et al.*, *supra*, E070630, as supplemented by the testimony adduced at the evidentiary hearing.

Noel and Carlos were longtime friends. Liliana Alverdin (Lily) is the older sister of Noel. Lily and Noel were very close and even shared a room in their parents' home. Lily also had a close relationship with Carlos, whom she thought of as a brother.

Prior to October 26, 2014, the date of Fabian's death, Lily had been in an on-again-off-again relationship with Fabian. In October, Lily and Fabian had serious problems and had not been together for months, but Lily wanted to work it out, and they sometimes saw each other.

A year earlier, Lily and Fabian had gotten into an argument while driving in Fabian's car and Fabian had left Lily off at the side of a road in an area of the desert.

---

[3]     The People apparently attached copies of the documents to its brief for the OSC hearing as exhibits in a separate envelope, requesting judicial notice of them. At the hearing, the People submitted on their papers. During argument, defense counsel made reference to one of the documents, our opinion from the direct appeal. The trial court made no direct ruling granting the People's request for judicial notice, but defense counsel requested that the record on appeal be augmented to include all of the materials to which the People's request for judicial notice referred, so they are part of the record on appeal.

Fabian would not answer his phone, so Lily called Fabian's grandparents and asked them to pick her up. Lily walked toward a gas station where she encountered two homeless men, one of whom brutally raped her. After the incident, Fabian's grandparents came and picked Lily up.

As a result of the brutal attack, Lily was bedridden for two weeks. Noel knew about the rape. After the rape incident, Lily and Fabian resumed their on-again-off-again relationship. However, Jose Benevides, Fabian's grandfather, had not seen Lily in eight months and Fabian had told Benevides that he did not want to see Lily anymore.

On October 26, 2014, Lily was hung over from drinking the night before and needed a ride to her job. Noel was unavailable because he was working with their father, who had a landscaping business, so Carlos picked Lily up. As Carlos and Lily were on their way to Lily's place of employment, Lily decided she did not feel like working because of her hangover. Instead, Lily and Carlos bought some beer and went to a park to drink it.

At the park, Lily and Carlos discussed their respective relationship problems. Lily believed Fabian was cheating on her, but she wanted to see Fabian. Lily sent Fabian a text message and Fabian told Lily to come over, but Lily had to wait until Fabian got home from working. Carlos took Lily home, by which time it was already dark, and then returned to pick Lily up with Noel in the car, to take her to Fabian's house, stopping on the way to buy more beer.

At about 9:30 p.m., Lily, Noel and Carlos arrived and parked in front of Fabian's house, at which time Lily noticed that Concepcion Fernandez, also called "Poncho," was parked behind them. The plan was for Noel and Carlos to drop Lily off and leave. Poncho was a neighbor of Lily's and Noel's who also worked for their father's landscaping business. Lily got out of the car and went up to knock on Fabian's door. Fabian eventually came outside and had a conversation with Lily in front of the house.

Fabian and Lily walked to where Carlos was looking at his car, which appeared to have damage from hitting something. Fabian asked what happened and after the men shook hands, Fabian and Lily walked away to talk. Lily told Fabian she had not gone to work. Fabian then told Lily he would be right back. When Lily asked if they were going inside his house, Fabian told her "Fuck no."

Lily became upset and got back into Carlos's car, waiting for Fabian to come over. Lily was sad, and her eyes were welling with tears as she sat in the back seat. Noel came over and asked Lily what was wrong, but Lily told him everything was okay, so Noel went back over to Poncho's truck.

A short time later, Fabian came back out of the house and Lily walked up toward him. Fabian asked Lily how the car was damaged and if she remembered crashing, but Lily did not recall. Fabian asked Lily how much she had been drinking and why she could not remember if they had crashed. Lily admitted she had been "drinking a lot."

Carlos approached Fabian and told Fabian, "We're going to leave, dog." Carlos held out his hand as if to shake hands and Fabian extended his hand. Carlos grabbed

5

Fabian's hand and pulled Fabian into the street. Fabian fell to his knees and Carlos started kneeing him. Noel ran up.

Lily tried to pull Carlos away from Fabian, telling Carlos to leave Fabian alone, but Noel got Fabian in a headlock. While Noel had Fabian in a headlock, Lily saw that Carlos had something shiny and it was pointed at Fabian's neck. Carlos and Noel asked Fabian what Fabian had done to Lily, but Fabian denied doing anything to Lily. Lily told Carlos and Noel to let Fabian go, because he had not done anything.

During this assault, Fabian never hit back; he just tried to get away. At one point Carlos and Noel did lose control of Fabian, but Noel got Fabian back in a headlock. Carlos still had the shiny object pointed at Fabian's neck, and Carlos and Noel kept asking Fabian what he had done to Lily. Then Noel switched hands, so he was holding Fabian in a headlock with his left hand instead of his right hand. They continued to struggle for a few seconds until Lily noticed that Noel had pulled out something black from his waistband and pointed it at Fabian's head.

While Lily was trying to get Carlos off Fabian, Carlos elbowed Lily, causing her to fall backwards. When Lily tried to get up, she heard a clicking sound, that sounded like racking a gun, a sound with which she was familiar. A few seconds later, as Lily was still getting up, she heard a gunshot. Carlos and Noel immediately ran to Carlos's car, and Poncho left in his truck. Lily screamed for help as Fabian had been shot in the head. Noel led Lily to the car and the three of them drove off. A neighbor, hearing Lily's

6

scream and the sound of a car "peel[ing] out," went out to find Fabian in the middle of the street and called for paramedics.

Carlos, Noel, and Lily drove until they reached a casino where the car broke down. They emptied the car, including the box of beer they had bought before going to Fabian's house. Carlos, Noel and Lily started to walk through the desert along the freeway as Noel tried to get rid of something that was wrapped in a white shirt near some bushes that bordered the freeway. When Noel returned from the area of the bushes, the three of them proceeded to walk through the desert wash area.

Along the way, Carlos, Noel, and Lily talked about what had happened to Fabian and Carlos told Lily not to say anything to the police. Carlos told Lily to tell the police that Carlos and Noel had just dropped Lily off at Fabian's and did not return and that Lily had walked home, leaving Fabian alive when she left.

In a pretrial statement to law enforcement, which was admitted into evidence, Lily stated she told Noel it was his fault, but Noel told her: "'I'm sorry. I'm sorry. I didn't mean to do that. It was an accident. He moved my hand and it shot by itself.'"[4] Lily responded, "'I seen you when you clocked [*sic*] it back.'" Noel replied, "'I was just tryin' to scare him.'"

---

**4**      Other statements attributed to Lily, Noel or Carlos, are taken from Lily's recorded statements, which were admitted at trial.

Carlos, Noel, and Lily ended up on Indio Boulevard where Carlos's car broke down at a casino. Carlos called his mother to get a ride home, while Noel and Lily took a cab to get home. Carlos and Noel wiped down the car door handles with their shirts. They also tried to get everything out of the car.

As Carlos, Noel, and Lily walked through the desert, Carlos and Noel dropped items in the bushes and leaves, including their shirts. Along the way, Lily screamed at Noel: "'You fuckin' did this. It was your fault. You killed him.'" Carlos warned Noel that Lily would "'snitch on'" them. Noel urged Lily not to say anything, but she responded, "'You just killed the man that I love. Like, how am I not gonna tell when you just killed him, like, cold-blooded.'" Carlos then told Noel something that Lily could not hear, but Noel told Carlos he could not do that to Lily. Carlos then told Noel to shoot him, and told Lily that "If we get caught, if you snitch on us, we're gonna say that you planned this out and that you did this," and if she "rat[ted them] out," he would "take [her] down with [him], and say that Lily was the one who told them to shoot Fabian, or that Lily shot Fabian herself.

Later, after interviewing Lily, law enforcement officers learned that Noel was involved, and arranged for his transport. They also contacted Carlos later that morning, after contacting Carlos's mother at work, and transported him to the station. Lily showed investigators where Noel dumped the gun. The gun was "single-action," meaning the hammer had to be cocked for the trigger to fire a bullet. About seven pounds of pressure was required to pull the trigger.

8

A sergeant with the sheriff's department obtained information about Carlos's vehicle from Carlos's father and obtained the license's plate number of the vehicle, for which a records check was conducted. They learned that the vehicle had been towed away at the request of the casino, after a casino security officer found the vehicle abandoned. Upon inspecting the vehicle, sheriff's investigators found traces of blood near the rear passenger door. The blood matched Fabian's DNA. The vehicle also appeared to have damage on the driver's side door.

The desert wash area where Lily, Noel and Carlos had walked was also searched by sheriff's investigators, who had seen surveillance video of the vehicle circling the parking lot, parking briefly, and then driving to the frontage road. A gun, a Browning 9-millimeter, was found in the vicinity where the car stopped, near a tree among some trash, wrapped in a black sweatshirt; and a magazine was also found in the area. The ammunition found was RP 9-millimeter Luger. The black sweatshirt had Noel's DNA in the collar and blood spots on the sweatshirt matched Fabian's DNA.

Another magazine was found in a search of Noel's back yard, for a 9-millimeter Luger. In Noel's bedroom, they found some Nike Jordan high top tennis shoes, the sole pattern of which matched shoe tracks found in the desert. They also seized some tan pants which had blood spots that matched Fabian's DNA. The gun was later found to have traces of blood on it, which matched Fabian's blood. The magazine in evidence was found to fit perfectly into the gun. A cartridge from that magazine was test fired and the

casing matched the casing found at the scene of the shooting. A comparison of the bullet found in Fabian's body and the test fired bullet resulted in a match.

An autopsy showed that Fabian had died of a gunshot wound, and that he had sustained multiple abrasions, lacerations, and contusions on his face. The bullet had entered the top of the head on the left side, exited through the neck on the left side, and then entered the top of his shoulder, where it was located just beneath the surface. The shot was fired from approximately one foot away.

During Lily's first interview with detectives, she told them that Noel and Carlos had dropped her off at Fabian's place and that Lily walked home. The next day, however, Lily told police that she lied about Noel's involvement and that her prior statement was what she was instructed by Carlos to say, and that she had given that statement because she was afraid.[5]

Noel and Carlos were arrested and charged by information with the murder of Fabian (§ 187, subd. (a), count 1.) As to Noel, it was further alleged he had personally and intentionally discharged a firearm causing death, within the meaning of section 12022.53, subdivision (d). As to Carlos, it was further alleged that he personally used a deadly weapon, a screwdriver, within the meaning of section 12022, subdivision (b)(1).

---

[5]     The second statement is the version of events to which Lily testified at the preliminary hearing, and which was read to the jury when the trial court found her inability to recall certain facts to be incredible, pursuant to *People v. Green* (1971) 3 Cal.3d 981 (on remand from the United States Supreme Court, *California v. Green* (1970) 399 U.S. 149).

10

After being amended, the information included a second count against Carlos, only, which, alleged an assault with a deadly weapon, pursuant to section 245, subdivision (a)(1). Also, as to Carlos only, the information alleged he had suffered a prior serious felony under the Three Strikes law, as well as a serious felony (nickel) prior, pursuant to section 667, subdivision (a).

During trial, Noel introduced testimony from his father who indicated that Noel was present when Lily arrived home after the incident where Fabian abandoned her in the desert, where Lily was raped and injured to the point of requiring crutches to walk for two weeks afterwards. Noel lived in the home and shared a room with Lily, who was bedridden for two weeks after the incident. Noel's trial counsel argued to the jury that due to what Noel experienced with Lily, Noel did what he did as a result of a heat of passion.

Counsel for Carlos argued that Carlos merely started a fight with Fabian, Carlos did not put a screwdriver to Fabian's neck or do anything else to aid and abet a murder, and that surveillance video at the casino which showed Carlos running ahead of Noel implied that Carlos wanted nothing to do with what Noel had done.

The jury convicted Carlos and Noel as charged of second degree murder in count 1, and convicted Carlos of assault with a deadly weapon in count 2. The jury found true the allegation that Noel had personally discharged a firearm causing great bodily injury or death (§ 12022.53, subd. (d)), and that Carlos had personally used a deadly weapon (screwdriver) in the commission of the murder (§ 12022, subd. (b)(1)).

11

On May 18, 2018, as to Carlos, the court found both the strike prior and nickel prior allegations true. Carlos made a motion for a mistrial, which was denied, and requested that the court exercise its discretion to strike the strike allegation, pursuant to *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497, which was also denied.

The court sentenced Carlos to an indeterminate term of 36 years to life, comprised of a term of 15 years to life, doubled under the Three Strikes law (§ 667, subd. (e)(1)) for count 1, plus a consecutive determinate term of one year for the deadly weapon allegation, plus five years for the nickel prior, pursuant to section 667, subdivision (a); the court stayed a six-year midterm sentence for count 2 pursuant to section 654. Carlos was ordered to pay $3,000[6] for a restitution fine and parole revocation restitution fine (suspended), plus additional fees, with victim restitution to be determined by the probation department. The court also ordered Carlos and Noel to reimburse the victim's compensation fund in the amount of $7,871.

---

[6] The court originally imposed restitution fines in the amount of $10,000 for Carlos without objection. This ordinarily results in a forfeiture of the issue. (See *People v. Avila* (2009) 46 Cal.4th 680, 729; see also, *People v. Smith* (2020) 46 Cal.App.5th 375, 395; *People v. Taylor* (2019) 43 Cal.App.5th 390, 401.) However, after the appeal had been perfected, Carlos's appellate counsel submitted a letter to the sentencing court pursuant to section 1237.2, arguing the court erroneously imposed the restitution fines without considering his inability to pay. The trial court reduced the restitution fine and parole revocation restitution fines to $3000. Currently, the Supreme Court is considering the question of whether a trial court lacks jurisdiction to entertain such motion, where issues other than the imposition of the restitution fine are raised on appeal. (See *People v. Jenkins* (2019) 40 Cal.App.5th 30, 38, review granted Nov. 26, 2019, S258729.)

Carlos and Noel timely appealed.  (*Hernandez et al.*, *supra*, E070630.)  On direct appeal, the convictions were affirmed, but the matter was remanded to allow the superior court the opportunity to exercise discretion to strike Noel's firearm enhancement pursuant to section 12022.53, subdivision (d), in light of the recent amendment to section 12022.53, subdivision (h).  We also agreed that on remand the superior court could consider whether to strike Carlos's serious felony prior conviction enhancement (§ 667, subd. (a)(1)), considering the then recent amendment to section 1385, which provides the trial court with authority to strike such an enhancement.  (*Hernandez et al.*, *supra*, E079630.)

On September 26, 2022, Carlos filed a petition for resentencing pursuant to sections 1172.6 (formerly 1170.95).  The parties stipulated to the issuance of an order to show cause (OSC).

Carlos called codefendant Noel as a witness to testify at the August 18, 2023 evidentiary hearing.  At that hearing, Noel testified that he and Carlos had worked on the day of the shooting, and after work they dropped Noel's sister, Lily, off at Fabian's house.  A few months before this incident,[7] Lily and Fabian had gotten into an argument and Fabian had thrown Lily out of Fabian's car, after which, Lily was raped, which made Noel angry.

---

[7]     At trial, there was evidence that this incident occurred a year earlier.  See page 4, *ante*.

13

Lily talked with Fabian for a little bit, but then headed back towards Noel's car crying. Noel asked Lily what was wrong; at this time, Carlos was talking to Noel's neighbor. Noel waited for Fabian to come back out, and when Fabian did so, Noel went and asked him what he did to Lily. Fabian said he did not do anything to Lily.

Then Noel and Fabian began to fight. Carlos did not join in that fight. At some point during the fight, Noel pulled out the gun[8] because Fabian had gotten the best of Noel. Noel never told Carlos he had a gun. Noel only intended to scare Fabian with the gun, but when Fabian tried to get out of Noel's headlock, the gun "just went off." Noel denied knowing that the gun was loaded and stated that anyone who said they heard a gun being "racked" was mistaken. However, Noel acknowledged that his gun had a "slider."

After the shooting, Carlos was shocked, and he, Noel and Lily went to a casino. Noel did not recall Carlos shaking Fabian's hand and pulling Fabian down. Noel never saw Carlos with a screwdriver to Fabian's neck.. Carlos did not touch Fabian.

The trial court found Noel not credible. The court took the matter under submission. On September 12, 2023, the trial court denied the resentencing petition.

---

[8] Noel did not remember where or from whom he bought the gun, or whether the person who sold it to him was a man or a woman. Noel purchased the gun for his own protection because he had been jumped in the past.

14

However, because, by the time of the hearing, section 1385 had been amended again,[9] the court considered Carlos's motion to strike the nickel prior and the weapon enhancement. The trial court declined to strike the nickel prior but agreed to strike the weapon enhancement previously imposed pursuant to section 12022, subdivision (b)(1).

Carlos appealed.

DISCUSSION

1. *Whether the Trial Court Properly Understood the Elements of Murder in Denying the Petition for Resentencing*

Carlos argues that the court's conclusion in the resentencing hearing that he directly aided and abetted second degree murder was erroneous both in terms of its purely legal analysis and in terms of the evidentiary support for the conclusions reached. Relating to his challenge to the trial court's legal analysis, Carlos argues that the court misunderstood the elements of murder in stating at one point that Carlos's conduct was completely consistent with a direct aider-abettor, and providing an analogy to explain how it determined Carlos acted with implied malice. In addition, Carlos argues there is

---

[9]    Section 1385 was amended pursuant to Senate Bill No. 81 (Stats. 2021, ch. 721, § 1), adding subdivision (c) to section 1385, effective January 1, 2022, allowing the trial court to dismiss any enhancement "in the furtherance of justice" (§ 1385, subd. (c)(1)) unless otherwise prohibited, and providing that nine enumerated mitigating circumstances should weigh greatly in favor of dismissing the enhancement, unless that dismissal of the enhancement would endanger public safety.  (§ 1385, subd. (c)(2).)

15

insufficient evidence to support the trial court's finding of implied malice for second degree murder.  We disagree with these contentions.

      a.  *Overview of Legal Principles Governing Petitions Under Section 1172.6*

"The Legislature enacted Senate Bill No. 1437 (2017-2018 Reg. Sess.) to 'amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.' (Stats. 2018, ch. 1015, § 1, subd. (f).)" (*People v. Vargas* (2022) 84 Cal.App.5th 943, 950 (*Vargas*).)

"Senate Bill No. 1437 (2017-2018 Reg. Sess.) and its amendment to section 188 eliminated potential aider and abettor liability for first or second degree murder under the natural and probable consequences doctrine by requiring that a principal 'act with malice aforethought' to be convicted of murder; there is no exception for accomplices.  (§ 188, subd. (a)(3).)" (*Vargas*, *supra*, 84 Cal.App.5th at p. 950, citing *People v. Gentile* (2020) 10 Cal.5th 830, 846 (*Gentile*).)

Senate Bill No. 1437 did not "eliminate direct aiding and abetting liability for murder because a direct aider and abettor to murder must possess malice aforethought." (*Gentile*, *supra*, 10 Cal.5th at p. 848, superseded by statute on other grounds as stated in *People v. Wilson* (2023) 14 Cal.5th 839, 869.)

Section 1172.6 sets out the procedure by which a person convicted of murder under a natural and probable consequences theory may be resentenced if they could no

longer be convicted of murder because of the changes to section 188. (§ 1172.6, subd. (a)(3); *People v. Strong* (2022) 13 Cal.5th 698, 708 (*Strong*).)  If the petitioner establishes a prima facie case for relief, the superior court issues an order to show cause (§ 1172.6, subd. (c)), and the matter proceeds to an evidentiary hearing unless the parties waive the resentencing hearing and stipulate that the defendant may be resentenced.  (§1172.6, subds. (d)(1) & (2).)

At the evidentiary hearing, it is the prosecution's burden to prove beyond a reasonable doubt that the petitioner is ineligible for resentencing.  (§ 1172.6, subd. (d)(3); *Strong*, *supra*, 13 Cal.5th at pp. 708–709.)  "The admission of evidence in the hearing shall be governed by the Evidence Code, except that the court may consider evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed." (§ 1172.6, subd. (d)(3).)  Additionally, "the prosecutor and the petitioner may also offer new or additional evidence to meet their respective burdens."  (*Ibid.*)

Also, at the "evidentiary hearing under section 1172.6, subdivision (d)(3), the trial judge is charged with determining, beyond a reasonable doubt, if the petitioner is guilty of murder under a theory that remains valid after the amendments to the substantive definition of murder." (*Vargas, supra*, 84 Cal.App.5th at p. 952.)  If the superior court finds beyond a reasonable doubt that the petitioner is guilty of murder notwithstanding the amendments to sections 188 and 189, the petitioner is ineligible for relief under

17

section 1172.6. (§ 1172.6, subds. (a)(3) & (d)(3); *Strong*, *supra*, 13 Cal.5th at pp. 708–709; *Vargas*, at p. 951.)

      b. *Whether the Trial Court Understood the Elements, and Whether There is Substantial Evidence to Support the Trial Court's Findings that Carlos Was a Direct Aider-Abettor Who Acted With Implied Malice*

Carlos attempts to persuade us to apply the reviewing standard of independent review by arguing that the trial court misunderstood the elements of murder as well as the prosecutor's burden at an evidentiary hearing on a resentencing petition. In this regard, Carlos complains that the court applied the wrong legal standard by indicating that Carlos's conduct was completely "'consistent with' a particular state of affairs," which is not equivalent to a determination of guilt beyond a reasonable doubt. Carlos also complains about an analogy used by the trial court to explain how it determined Carlos had the requisite mental state.[10] We are not persuaded.

At an evidentiary hearing on a resentencing petition, the "question is whether the petitioner committed murder under a still-valid theory, and that is a factual question." (*People v. Clements* (2022) 75 Cal.App.5th 276, 294.) At the hearing, the trial court has

_____

[10] The trial court explained that intent can be discerned from actions, using, as a metaphor, a silent film in which a car pulled up and two people got out, open the trunk from which they each remove a bag full of golf clubs, proceed to the golf course, and begin to play golf. The court explained that even without any verbal statements of their intent, it can be determined golfers intended (or conspired) to play golf. The court then turned to the facts of the instant case to explain how the actions of Carlos and Noel "tells us everything about what they intended."

18

the "responsibility to act as independent fact finder and determine whether the evidence establishes a petitioner would be guilty of murder under amended sections 188 and 189 and is thus ineligible for resentencing." (*People v. Ramirez* (2021) 71 Cal.App.5th 970, 984 (*Ramirez*).)  Here, the court provided a detailed summary of the evidence it had reviewed and heard, and drew inferences from circumstantial evidence, to support its factual findings.  Those findings, in turn, led to its judgment that Carlos was guilty beyond a reasonable doubt under the current definition of murder.

Carlos's criticism that the trial court, after summarizing his actions, found (among other findings) that his conduct was "completely consistent" with a direct aider-abettor, does not demonstrate the court misunderstood the elements of murder.  Carlos has taken isolated comments out of context and ignored the full text of the trial court's reasoning, which reveals the court well understood the elements of murder and the People's burden of proof at the evidentiary hearing.

The court's full statement was, "In short, [Carlos's] conduct was completely consistent with aiding and abetting the violent—and when I say "violent" I mean violent by means of force likely to produce great bodily injury and death upon [Fabian]. [Carlos's] reactions when greater deadly force than he himself was employing were completely consistent with wishing to further aid and abet the greater use of force that was being employed by [Noel]."

In this respect, Carlos's assertion that the court's reference to his conduct as "completely consistent with aiding and abetting" or its analogy to explain how his

conduct led to an inference regarding his mental state, did not demonstrate any misunderstanding. Instead, the statement that it found "[Carlos's] conduct was completely consistent with aiding and abetting" elucidated its reasons for its finding that Carlos's intent was to aid and abet Noel in the murder itself where Carlos continued to hold the screwdriver to Fabian's neck even after the gun was drawn. The court's purpose was to show that the conviction was proper under current law and was not based on the natural and probable consequences doctrine. It was not an indication that the court misunderstood the elements of murder.

Like the court's golf analogy, the court's statements summarized the evidence that gave rise to its factual finding that Carlos had the requisite mental state (implied malice), an essential element of murder. As the court explained, "It's rare that people tell us exactly what they intend to do. So we have to decide whether we can tell what folks' intent was by their actions."

The court's reasoning and its analogy were proper, when reviewed in their proper context, given that the amendments to the murder statutes was to ensure that a person convicted of murder had the requisite mental state of malice. (§ 188, subd. (a)(3).) In any event, "we review the ruling, not the reasoning." (*People v. Mickey* (1991) 54 Cal.3d 612, 655-656; see *Raju v. Superior Court* (2023) 92 Cal.App.5th 1222, 1234 [reviewing an order sustaining demurrer].)

For this reason, we are not required to apply the independent or *de novo* standard of review.

20

Alternatively, Carlos argues there is insufficient evidence to support the trial court's ruling denying his resentencing petition.  We disagree.

At an evidentiary hearing on a resentencing petition, the trial court bears the "responsibility to act as independent fact finder and determine whether the evidence establishes a petitioner would be guilty of murder under amended sections 188 and 189 and is thus ineligible for resentencing." (*Ramirez*, *supra*, 71 Cal.App.5th at p. 984.)  "We review the trial court's fact finding for substantial evidence." (*People v. Bascomb* (2020) 55 Cal.App.5th 1077, 1087; see *Ramirez*, at p. 984.)

"Under this familiar standard, '"we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citation.]  We determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." [Citation.]  In so doing, a reviewing court "presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence."' [Citations.]  Substantial evidence also '"includes circumstantial evidence and any reasonable inferences drawn from that evidence."'" (*Vargas*, *supra*, 84 Cal.App.5th at p. 951.)

Carlos's petition turned on the question of whether he acted with implied malice.  "Although Senate Bill [No.] 1437 amended the felony-murder rule to ensure that murder

21

liability would be imposed only on perpetrators with malice aforethought, it did not change the definition of malice." (*People v. Didyavong* (2023) 90 Cal.App.5th 85, 95 (*Didyavong*), citing *Gentile, supra*, 10 Cal.5th at p. 844.) Implied malice exists "if 'someone kills with "no considerable provocation … or when the circumstances attending the killing show an abandoned and malignant heart.""" (*Gentile*, at p. 844, citing § 188, subd. (a)(2).) "'In short, implied malice requires a defendant's awareness of engaging in conduct that endangers the life of another.'" (*Didyavong*, *supra*, at p. 95, quoting *People v. Cravens* (2012) 53 Cal.4th 500, 507.)

In its factual findings relating to the events unfolding at the time of the murder, the court summarized the evidence in light of what both Carlos and Noel knew; they knew that Lily was upset after speaking with Fabian and Noel was angry with Fabian over the incident (occurring at some point previous to the murder) in which Lily was thrown out of Fabian's car and ended up being raped by some homeless men.

The court found that Carlos was the primary (initial) aggressor and the first person to pull a weapon on Fabian. Addressing Carlos's mental state at the time of the incident, even if the court assumed Carlos did not know that Noel had a gun, it noted that Carlos's conduct after the gun was produced was to continue to hold the screwdriver to Fabian's neck, and that, when Noel applied deadly force, Carlos ran with Noel back to the car, never expressing any surprise that Noel had shot Fabian.

The court also noted that in the car after the shooting, there were no statements of surprise or indications that the shooting was unintended. Instead, all the discussions

centered on making sure Lily did not tell anyone what really happened, giving Lily an alternative version of what happened and trying to destroy or remove evidence.

From these findings, the court concluded, "that the People did prove at trial beyond a reasonable doubt that [Carlos] was guilty as an aider and abettor, excluding natural and probable consequences theories." The court then found by proof beyond a reasonable doubt that Carlos is guilty of second degree homicide, and ineligible for any further relief under section 1172.6. While the court omitted to insert the word "direct" before "aider and abettor," this finding is implied from the fact the court added, "excluding the natural and probable consequences." No other interpretation is reasonable or appropriate.

The evidence amply supports the court's conclusion. Carlos was aware he was engaging in conduct that endangers the life of another when he personally held a screwdriver to Fabian's neck after pulling Fabian up from the ground and after Carlos beat Fabian. Carlos's act of continuing to hold the screwdriver at Fabian's neck, after Noel approached and pulled out the firearm, manifested Carlos's intent to aid and abet Noel's violent act that had a high likelihood of causing death. After the shooting, Carlos ran to the car with Noel to make a getaway, without expressing surprise or even concern for Fabian, and contrived scenarios for Lily to provide.

Only infrequently do we encounter a record in which a defendant articulates his mental state for our evaluation. Like the trial court, we review the record and evaluate the conduct of the actors for inferences about their mental state. Here, Carlos's conduct

23

when Noel pulled out his firearm reveals Carlos intended to aid, abet, encourage, and facilitate Noel's conduct involving the firearm, understanding the likelihood of deadly consequences, by Carlos's continuing to hold the screwdriver at Fabian's neck. None of Carlos's conduct at the time of and after the shooting supports Carlos's assertions he was not aware Noel had the gun or that Noel would shoot Fabian.

There is substantial evidence to support the trial court's findings.

2. *The Trial Court is Presumed to Have Considered Carlos's Youth in Making its Ruling*

Carlos argues that irrespective of our conclusion on the merits of the resentencing petition, remand is necessary to give the trial court an opportunity to consider the role of his youth in the commission of the crime. The People argue that the court presumably did consider his youth, and that any error is harmless.[11] We agree with the People.

The record from the direct appeal shows that at the time of Carlos's sentence, defense counsel argued Carlos's youth in connection with his invitation to strike his prior felony conviction, referring to *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497. "We presume the trial court has considered all relevant factors in the absence of an affirmative record to the contrary." (*People v. Edwards* (2022) 76 Cal.App.5th 523, 529.) After the pronouncement of sentence, Carlos requested, and was granted leave to submit

---

[11]    In the introduction to respondent's brief, the People indicated a position that it was not opposed to remanding the case for consideration of Carlos's youth. However, in the body of the brief, they apparently retreated from this position, arguing instead that the court did consider the youth factor, but even assuming it did not, any error was harmless.

24

"a statement of view [*sic*] under [section] 1203.01 relating to the youthful offender under *Franklin.*"**12** We assume that intention was carried out. (Evid. Code, § 664.)

After the evidentiary hearing, counsel again requested that the court consider Carlos's youth in considering whether to strike the nickel prior enhancement. The trial court did consider Carlos's youth. It stated, "So [Carlos] is youthful, and the code tells me to take a look at that. When I think about people's youthful age, what is important to me is—especially if this is to come out right. Right? If this is their first crime, we should be taking it into consideration. This wasn't [Carlos] come out crime. As an adult he was either on probation or parole for one that he had just done."

When counsel urged the court again to consider Carlos's youth, the court stated, "I do find that [Carlos] was youthful at the time of the commission; however, I am—were this the first crime he ever committed, I would be much more cognizant of his youthful nature.· And I'm aware of the studies that say the brain does not fully mature until people reach the age of 25. [¶] However, there is nothing more sobering that I can think of than entering into the criminal justice system, and entering into the criminal justice system for a prior felony conviction.· So the more of those things I see from a particular defendant, the less likely I am to consider their youth because the gravity of what can happen has been brought squarely to their awareness."

---

**12** See *People v. Franklin* (2016) 63 Cal.4th 261, 277.

Again, after the court ruled on the resentencing petition, Carlos asked the trial court to consider his youth as a consideration of his request to strike one of the enhancements under the provisions of the recently passed amendment to section 1385, subdivision (c). The court expressly rejected the youth factor but agreed to strike one of the enhancements based on section 1385, subdivision (c), the multiple enhancement provision. (§ 1385, subd. (c)(2)(B).) It selected the lesser enhancement (§ 12022, subd. (b)(1)) to strike, leaving the nickel prior.

Now Carlos requests that we remand so the court can (again) consider his youth in the context of his resentencing petition. We decline the invitation. The resentencing petition was directed only at whether Carlos was guilty of second degree murder with implied malice. Carlos's petition argued that he could not be convicted of murder after the statutory amendments because at his trial, the People proceeded under the theory that Carlos either directly aided and abetted Noel or that Carlos aided and abetted an assault with a firearm and guilty under the natural and probable consequences doctrine. This allegation was sufficient for a prima facie showing, resulting in the stipulation to issue the OSC.

At the hearing, defense counsel argued that Carlos was young at the time of the offense, indicating that his youth was a factor in considering whether someone has exhibited reckless indifference to human life. The trial court impliedly rejected this factor when it concluded Carlos was ineligible for resentencing, given the state of the law at that time.

26

We recognize that a few years prior to the evidentiary hearing in this case, published decisions began recognizing that youth is a relevant factor on mental state in section 1172.6 petitions. (See *People v. Harris* (2021) 60 Cal.App.5th 939, 960, review granted Apr. 28, 2021, S267802, and review dismissed Sept. 28, 2022; *In re Moore* (2021) 68 Cal.App.5th 434, 451, 454; see also, *People v. Pittman* (2023) 96 Cal.App.5th 400, 416.)

We presume the trial court considered this factor because the issue of youth had been raised at trial, at the original sentencing, and again in arguments after the evidentiary hearing. We presume the trial court was aware of the state of the law and the several published opinions addressing this issue. (*People v. Caparotta* (2024) 103 Cal.App.5th 874, 905.) Further, Evidence Code section 664 provides that "[I]n the absence of evidence to the contrary, we presume that the court 'knows and applies the correct statutory and case law.'" (*People v. Thomas* (2011) 52 Cal.4th 336, 361.)

Given the evidence presented both at the original trial and at the evidentiary hearing on the resentencing petition, and the trial court's rejection of the youth factor in deciding whether Carlos was eligible for resentencing, Carlos's youth did not warrant resentencing.

**DISPOSITION**

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ              
P. J.


We concur:

CODRINGTON         
J.

RAPHAEL            
J.